## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |
|---|---|
| **TIMBERLINE HOLDINGS III, LLC,** *et al.*,<br>　　Plaintiffs,<br><br>**v.**<br><br>**YANAI ORON**, *et al.*,<br>　　Defendants. | **Case No. 2:25-cv-1001-CLM** |

## MEMORANDUM OPINION

Plaintiffs in this case collectively invested around $3 million to buy stock in what they thought would be the next big artificial intelligence ("AI") start-up company. The company was called Joonko. The founder of the company, Ilit Raz, told Plaintiffs that Joonko used advanced AI systems, and had Fortune 500 clients, glowing testimonials from its customers, and promising revenue projections. These were all lies. And as the lies piled up, so did the investors who wanted in on the action, including the Defendants in this case who collectively invested over $20 million into Joonko stock.

Eventually, the house of cards came crashing down. After Raz's lies came to light, Raz was charged with federal crimes, the stock was worth nothing, and the investors were left holding the bag. As one would expect, Plaintiffs wanted their money back. But with Raz facing criminal charges and Joonko in bankruptcy, Plaintiffs' options were limited. So Plaintiffs sued their co-investors (and co-victims) for federal securities violations and breach of fiduciary duties. Defendants move to dismiss all Plaintiffs' claims, or alternatively, to transfer the federal claim and dismiss the state-law claim on *forum non conveniens* grounds. For the reasons explained below, the court **GRANTS IN PART** Defendants' motion to transfer and dismiss. (Docs. 22, 26).

## BACKGROUND

Below the court presents the facts which it draws from three sources: (1) Plaintiffs' operative complaint, (2) documents the complaint incorporates by reference, and (3) judicially noticed documents. When necessary, the court explains the difference between these sources and the purposes for which the court considers them. Regardless of their origin, the court presents the facts in the light most favorable to Plaintiffs.

### A.    Raz Founds Joonko and Pads the Stats

In 2016, Ilit Raz founded Joonko Diversity, Inc. ("Joonko") as a Delaware corporation and became its CEO. At its founding, Joonko's stated mission was to use artificial intelligence and data to identify and solve unconscious gender and racial bias within companies by tapping into their workflow and task management platforms. Joonko purportedly used automated technology to match underrepresented candidates with job opportunities at its customer companies, helping to fulfill its customers' diversity recruitment goals. To raise funds for Joonko, Raz needed investors, and she wasn't afraid to stretch the truth or flat out lie to get those investors on board.

By 2021, Raz was emailing investors and giving presentations to boast Joonko's business model and success. Raz told investors that Joonko had anywhere from 120 to 200 customers using its platform, including many Fortune 500 companies. But none of that was true. Raz showed investors several testimonials from purported customers praising Joonko's effectiveness. But they were all fake. Raz said Joonko had more than 40,000 (and later over 185,000) candidates in its talent pool. It did not. Raz touted several AI algorithms and processes that Joonko used on its platform. But Joonko did not have those processes or capabilities. And Raz told investors that Joonko was generating millions of dollars in revenue, when in fact Joonko's revenue never exceeded $100,000.

Raz knew that her representations about Joonko were all lies, but no one else did. And Raz made sure it stayed that way. For example, during the investors' due diligence process in early 2022, Raz provided investors with fictitious references to vouch for Joonko's products. When investors expressed concerns about Joonko's performance in 2023, Raz created fake customer contracts, forged signatures, and falsified bank statements to hide the reality of Joonko's less than stellar operation.

The smoke and mirrors worked for a time. Raz misled everyone into believing that the company was thriving and investors poured millions into Joonko based on Raz's fiction. But Raz isn't the focus of this story; the investors are. Both the Plaintiffs and the Defendants were investors in Raz's fraudulent scheme. So let's back up to who those parties are and how they got involved.

### B.    Early Investors and Members of the Board

Plaintiffs share two things in common: they are all from Alabama, and they were early investors in Joonko. The Plaintiffs include: Timberline Holdings III, LLC; Timberline TMG, LLC (together "Timberline Plaintiffs"); Martin Damsky; Heidi Damsky; BHM Venture Investments; and Bronze Valley Corp. (collectively "Plaintiffs").

Between 2017 and 2022, Joonko engaged in multiple rounds of fundraising in exchange for equity ownership interests in Joonko. In the early stages, Joonko issued a series of convertible notes to a number of investors, including Plaintiffs. Specifically, each Plaintiff acquired "preferred seed 1 stock" in the following amounts: $603,614 by the Timberline Plaintiffs; $219,497 by Martin and Heidi Damsky; $263,397 by Birmingham Venture Investments, LLC; and $263,397 by Bronze Valley Corp. The Timberline Plaintiffs also purchased $299,857 in "preferred seed 3 stock" and $500,000 in "preferred A-1 stock." (Doc. 12,

pp. 9-10).[1]

The operative complaint does not specify the dates on which Plaintiffs purchased most of these shares. The court does, however, have some additional insight into how the Timberline Plaintiffs acquired their "preferred A-1 stock."

*(1)    The Series A Stock Purchase Agreement*:

The Timberline Plaintiffs purchased their Series A shares in 2021 as part of a Series A Preferred Stock Purchase Agreement (the "Series A SPA"). (*See* doc. 26-2). And they were not the only ones to buy shares through the 2021 Series A SPA. Another purchaser listed on the Series A SPA is Defendant Vertex VI Fund L.P. ("Vertex").[2]

In the 2021 Series A round, Vertex invested $5 million in Joonko's Series A-1 preferred stock. Though still a minority shareholder, Vertex's investment was significant, and Vertex used its leverage to negotiate an added benefit: Vertex could appoint a member of Joonko's Board of Directors. Vertex chose Defendant Yanai Oron and agreed to indemnify Oron in his capacity as a director of Joonko (Vertex and Oron collectively, the "Vertex Defendants").

The Series A SPA, through which the Timberline Plaintiffs and Vertex acquired significant shares in Joonko, included a few provisions of note. First, the Series A SPA contained an exculpatory provision:

---

[1] Plaintiffs' operative complaint appears to conflate the number of shares purchased by each Plaintiff with the price actually paid for those shares. When possible, the court corrects these discrepancies based on the actual language of the Stock Purchase Agreements.

[2] The court notes in passing that the Series A SPA also appears to have converted the interests of some early investors holding "any Simple Agreement for Future Equity" to Series A-2 Preferred Stock. (*See* doc. 26-2, pp. 19, 35). The court does not know whether the share conversion affected any of the Plaintiffs here or whether the conversion made these early investors parties to the Series A SPA contract.

> 3.11  Exculpation Among Purchasers. The Purchaser acknowledges that it is not relying upon any Person, other than the Company and its officers and directors, in making its investment or decision to invest in the Company. The Purchaser agrees that neither any Purchaser nor the respective controlling Persons, officers, directors, partners, agents, or employees of any Purchaser shall be liable to any other Purchaser for any action heretofore taken or omitted to be taken by any of them in connection with the purchase of the Shares.

(Doc. 26-1, p. 19). The exculpatory provision was buttressed by a survival clause which provided that the representations and warranties made in or in connection with the Series A SPA would survive the execution of the agreement. (Doc. 26-2, p. 23). It also included a forum selection clause:

> 7.15  Dispute Resolution. (a) The parties (i) hereby irrevocably and unconditionally submit to the jurisdiction of the state courts of Delaware and to the jurisdiction of the United States District Court for the District of Delaware for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (ii) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the state courts of Delaware or the United States District Court for the District of Delaware, and (iii) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

(Doc. 26-2, p. 25).

5

Finally, the Series A SPA included a copy of Joonko's Certificate of Incorporation dated June 10, 2021, that contained its own forum selection clause for stockholder claims against Joonko or its Board. Like the language of the Series A SPA, the Certificate's designated forum was Delaware. (Doc. 26-2, p. 68).

### (2)    The Series B Stock Purchase Agreement:

Joonko's fundraising efforts continued for another year, and in May 2022, Joonko closed its Series B fundraising round pursuant to a Series B Preferred Stock Purchase Agreement (the "Series B SPA"). (Doc. 22-2, pp. 4-68). The Series B investors included some familiar faces and some new ones. The Timberline Plaintiffs acquired about $700,000 in Series B preferred stock. Vertex invested another $3 million in the same. And a new player, Defendant Insight Partners, acquired $12 million Series B preferred stock.[3]

Like Vertex, Insight used its sizeable acquisition to negotiate for a seat on the Board and appointed Defendant Liad Agmon to fill it (Insight and Agmon collectively, the "Insight Defendants"). Insight also agreed to indemnify Agmon in his capacity as a director of Joonko.

The Series B SPA included many of the same contractual provisions as the Series A SPA. For example, the Series B SPA contained nearly identical exculpatory, survival, and forum selection provisions from the earlier contract. So the Series A and Series B SPAs not only served as the vehicles through which Joonko sold its securities and the investors purchased them, the SPAs also provided the terms for how the parties

---

[3] Grace Software Holdings III, LLC purchased Joonko's series B preferred shares. Grace Software Holdings III, LLC is one of many investment funds owned by and associated with the private equity firm Insight Partners. Insight Partners also consists of Insight Partners XII, L.P.; Insight Partners (Cayman) XII, L.P.; Insight Partners (Delaware) XII, L.P.; Insight Partners XII (Co-Investors), L.P.; Insight Partners XII (Co Investors)(B), L.P.; Insight Partners (EU) XII, S.C.SP.; and Grace Software Holdings III, LLC. All of these entities are named Defendants. Plaintiffs' operative complaint does not differentiate between these distinct entities. For convenience and consistency, court refers to these entities collectively as "Insight."

should settle their disputes if one arose from the contract.

### C.   The Board Discovers the Fraud

About a year after the close of Joonko's Series B offering, the walls started to close in on Raz and Joonko. With Vertex appointing Oron to the Board in 2021, and Insight appointing Agmon in 2022, the investors were beginning to peak behind the curtain of Joonko's operation. And things weren't adding up.

In 2023, some investors, including Defendants, and the Board began to question Joonko's performance. Raz tried to stave off the investors' concerns for a while by shuffling the falsified contracts and bank statements in front of them, but the Board's investigation persisted. In June 2023, the full Board, including Defendants Agmon and Oron, confronted Raz about the financial irregularities at Joonko and Raz finally admitted to her fraudulent activities. Raz resigned the same day.

Just a few days after Raz's resignation, on June 25, 2023, several national news outlets began reporting that Raz had resigned from Joonko following an internal investigation by the Board that found Raz had defrauded the company's investors. One year later, the United States Department of Justice issued a press release announcing the unsealing of an indictment charging Raz with securities fraud and wire fraud for defrauding investors and misleading them about core aspects of the company she founded.

### D.   Joonko Enters Bankruptcy

On May 24, 2024, Joonko filed for bankruptcy protection in the United States Bankruptcy Court for the District of Delaware. (*In re Joonko Diversity Inc.*, No. 1:24-bk-11007 (Bankr. D. Del. May 14, 2024)). During the bankruptcy proceedings, the firm of Bayard, P.A. was retained as special counsel to investigate possible claims against the outside directors, including Defendants. Bayard's investigation culminated in a confidential report (the "Bayard Report") which documented the history

of Joonko's fraud and its aftermath. The Bayard Report's findings are the foundation of Plaintiffs' factual allegations and underlying legal theories.

In August 2024, Plaintiffs filed a preliminary objection and reservation of rights to Joonko's liquidation plan. (*See* Bankruptcy Docket No. 130). Plaintiffs' primary objection was that Joonko's proposed bankruptcy plan provided a release from liability for Joonko's Board of Directors. Plaintiffs believed that the Directors knew or should have known about Raz's fraud and wanted to preserve the possibility of asserting claims against those Board members.

On August 12, 2025, the bankruptcy court entered its Findings of Fact, Conclusions of Law, and Order Confirming the Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Debtor (the "Confirmation Order"). (*See* Bankruptcy Docket No. 431). The Confirmation Order included a section describing the "Effects of Confirmation" of the bankruptcy plan. A few provisions within that section deserve a closer look. The Confirmation Order provides:

> 15. <u>Cancellation of Interests</u>. Except as otherwise provided in the Plan and in any contract, instrument, or other agreement or document created in connection with the Plan, on the Effective Date, all Interests shall be cancelled and each Holder thereof shall have no rights arising from or relating to such Interests or the cancellation thereof, except the rights provided pursuant to the Plan.
>
> 16. <u>Cancellation of Existing Securities and Agreements</u>. Except as otherwise provided in the Plan and in any contract, instrument, or other agreement or document created in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to Article III of the Plan, any promissory notes, share certificates, whether for preferred or common stock (including treasury stock), other instruments evidencing any Claims or Interests, and all options, warrants, calls, rights, puts, awards, commitments, or any other agreements of any character to acquire such Interests shall be deemed

8

> cancelled and of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order, or rule. The holders of or parties to such canceled notes, share certificates, and other agreements and instruments shall have no rights arising from or relating to such notes, share certificates, and other agreements and instruments or the cancellation thereof, except the rights provided pursuant to the Plan.
>
> 17. <u>Executory Contracts and Unexpired Leases</u>. Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, each of the Executory Contracts and Unexpired Leases to which the Debtor is a party shall be deemed automatically rejected by the Debtor as of the Effective Date, unless such contract or lease (i) previously has been assumed or rejected by the Debtor, (ii) expired or terminated pursuant to its own terms, (iii) was the subject of a motion to assume or reject pending before the Court as of the Confirmation Date or (iv) is identified on Exhibit D to the Plan as a contract to be assumed.

(Bankruptcy Docket No. 431, pp. 17-18).

The Confirmation Order also included an exhibit providing a non-exclusive list of claims and causes of action that Joonko would retain during and after the bankruptcy proceedings. (*See* Bankruptcy Docket No. 431-1, pp. 67-68). Among them were "[c]laims and causes of action against any and all current and former directors, officers and insiders of [Joonko]." (Bankruptcy Docket No. 431-1, p. 67). Then, on November 13, 2025, the Bankruptcy Court entered a stipulation that conferred Joonko's standing to assert the bankruptcy estate's director and officer claims to "certain shareholders," including Plaintiffs. (Doc. 12-1).

### E.    This Lawsuit

Plaintiffs filed this lawsuit in the Northern District of Alabama on June 23, 2025. (Doc. 1). After filing their complaint, Plaintiffs never perfected service on any of the Defendants. So on September 24, 2025, the magistrate judge then assigned to the case ordered Plaintiffs to show cause why the case should not be dismissed for failure to prosecute. (Doc. 4). Ten days later, and without seeking leave to do so, Plaintiffs amended their complaint. (Doc. 5). Then, on October 8, 2025, Plaintiffs responded to the show cause order, claiming that eight of the 10 Defendants accepted service of the amended complaint with an agreement to extend the time for Defendants to file an answer. (Doc. 6).

On December 9, 2025, before any of the Defendants filed an answer, and again without seeking leave, Plaintiffs filed the now operative Second Amended Complaint ("SAC"). (Doc. 12). The SAC asserted four counts:

- **Count I**: Violation of Section 12(a)(2) of the Securities Act of 1933 (15 U.S.C. § 77l(a)(2)), against all Defendants;
- **Count II**: Violation of Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)), and its corresponding regulation, 17 C.F.R. § 240.10b-5, against all Defendants;
- **Count III**: Breach of Fiduciary Duty against Defendants Oron and Agmon; and
- **Count IV**: Negligence and Wantonness against Defendants Oron and Agmon.

On January 29, 2026, Plaintiffs moved to voluntarily dismiss Counts I and IV of the SAC after realizing that Count I was "barred by the applicable statute of limitations" and Count IV was "encompassed" in Count III. (Doc. 21). The court granted Plaintiffs' motion to voluntarily dismiss Counts I and IV. (Doc. 33). So Counts II and III (shaded green above) are all that remain of Plaintiffs' operative complaint.

Both the Insight and Vertex Defendants move to dismiss Plaintiffs' remaining claims under Federal Rule of Civil Procedure 12, or, in the

alternative, transfer venue for the federal securities claim under 28 U.S.C. § 1404(a) and dismiss the state-law claim on *forum non conveniens* grounds. (Docs. 22, 26). The Defendants also move for Rule 11 sanctions against the Plaintiffs, Plaintiffs' counsel, Brandy Murphy Lee, and Lee's law firm, which Defendants say are mandatory under the Private Securities Litigation Reform Act, 15 U.S.C. § 78 *et seq*. (Docs. 23, 43).

## STANDARD OF REVIEW

In reviewing a complaint for failure to state a claim, the court accepts the allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *See Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1275 (11th Cir. 2012). The ultimate question is whether Plaintiffs' allegations, when accepted as true, "plausibly give rise to an entitlement of relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). Conclusory and general assertions are insufficient to state a claim on which relief may be granted. *See id*.

Normally, a court's analysis at the Rule 12 stage is limited to the pleadings and the attachments to it. But "when resolving a motion to dismiss or a motion for judgment on the pleadings, a court may properly consider a document not referred to or attached to a complaint under the incorporation-by-reference doctrine if the document is (1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged." *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024).

The requirements of the incorporation-by-reference doctrine are satisfied here as applied to three documents: (1) the Series A SPA; (2) the Series B SPA; and (3) the Bayard Report. First, the Series A and B SPAs satisfy the requirements. As the court explains in its discussion, both the Plaintiffs and the Defendants rely on the SPAs, which are referenced throughout Plaintiffs' operative complaint, are central to their claims, and are undisputed as to their authenticity. So the court will consider those documents in its analysis.

11

The court will also consider some of the factual findings in the Bayard Report, but only for the limited purpose of filling in minor gaps in Raz's fraudulent scheme and its discovery. The court does not doubt that the Bayard report is central to Plaintiffs' claims because they have said so themselves: "The Bayard report is essential to present to the Court facts upon which the Plaintiffs' claims arise[.]" (Doc. 35, p. 3). Because Plaintiffs sought leave to file the Bayard Report and asked the court to consider it, the court will do so. But because the court does not reach the merits of Plaintiffs' claims, the court only considers the Bayard Report for the contextual background it provides. The court will not disclose any of the confidential information contained within the Bayard Report.

In addition, "Federal Rule of Evidence 201 permits a court to 'judicially notice a fact that is not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Paez v. Sec'y, Fla. Dep't of Corr.*, 947 F.3d 649, 651 (11th Cir. 2020) (quoting Fed. R. Evid. 201(b)(2)); *see also Collier v. Buckner*, 303 F. Supp. 3d 1232, 1258 n.24 (M.D. Ala. 2018) ("A court may take judicial notice of the contents of public records, such as state court proceedings, without converting a motion to dismiss into a summary judgment motion.") (*citing Horne v. Potter*, 392 Fed. Appx. 800, 802 (11th Cir. 2010)). Importantly, bankruptcy filings are among those facts that a district court may take judicial notice without converting a motion to dismiss into one for summary judgment. *See, e.g.*, *Bobadilla v. Aurora Loan Servs., LLC*, 478 F. App'x 625, 627 (11th Cir. 2012) (affirming a magistrate judge taking judicial notice of separate bankruptcy proceedings); *United States v. Rey*, 811 F.2d 1453, 1457 n.5 (11th Cir. 1987) ("A court may take judicial notice of its own records and the records of inferior courts.").

So the court can take judicial notice of the bankruptcy court's Confirmation Order (Bankruptcy Docket No. 431). The bankruptcy court documents are not subject to reasonable dispute, and their contents can be accurately determined from the federal court docket, a source whose accuracy cannot reasonably be questioned and is on the public record.

12

## DISCUSSION

Defendants move to dismiss both of Plaintiffs' remaining claims, or in the alternative to transfer the federal securities claim to the United States District Court for the District of Delaware and dismiss the state-law claim on *forum non conveniens* grounds. (Docs. 22, 26). Plaintiffs oppose both the dismissal and the transfer of venue. The problem, though, is that Plaintiffs advance two theories—one to keep this case in Alabama, another to allow their claims to proceed—and the two are incompatible.

As explained below, rather than dismiss Plaintiffs' claims and decide Defendants' motions for sanctions, the court will grant Defendants' motion to transfer the federal claim and decline to exercise supplemental jurisdiction over the state-law claim. Plaintiffs' claims will live to fight another day, just not in this court.

## I.    The Federal Securities Claim (Count II)

The court begins with Plaintiffs' Section 10(b) claim and why it depends on the existence of the SPAs. The court then addresses Plaintiffs' theory that the Northern District of Alabama is the proper venue, based on their contention that the bankruptcy court voided the SPAs. Finally, the court explains why these two theories are incompatible and why transfer to the District of Delaware is the appropriate course.

### A.    Plaintiffs' Federal Claim Relies on the SPAs

In Count II, Plaintiffs assert that Defendants violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and its corresponding regulation, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"). To survive a motion to dismiss, a plaintiff asserting a claim under Rule 10b–5 must allege: "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the misrepresentation or omission and the loss[.]" *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019).

13

For now, the court focuses on the third element, connection with the purchase or sale of a security.

In *Blue Chip Stamps v. Manor Drug Stores*, the United States Supreme Court held that only actual purchasers or sellers of securities have standing to bring a private damages action under Section 10(b) or Rule 10b-5. 421 U.S. 723, 731 (1975). Consequently, "because an element essential to a violation of section 10(b) or rule 10b–5 is a sale or purchase, plaintiffs who have been unable to characterize their key transactions with the defendants as such have failed to invoke subject matter jurisdiction for those claims." *Delta Coal Program v. Libman*, 743 F.2d 852, 855 (11th Cir. 1984).

At least as to the Timberline Plaintiffs, the SAC leaves no doubt that the factual allegations supporting the Section 10(b) claim have a "connection with the purchase or sale of a security." *Carvelli*, 934 F.3d at 1317. In 2021 and 2022, Joonko sold, and the Timberline Plaintiffs purchased, "$680,100 in preferred A-1 stock" and "$402,390 in preferred series B stock." (Doc. 12, p. 9). Those transactions are memorialized in the Series A and B SPAs. And although the SAC does not mention the SPAs by name, it references them implicitly through its repeated description of the Series A and B fundraising rounds.

The SPAs are a double-edge sword for the Timberline Plaintiffs. On one hand, the SPAs prove they have *Blue Chip* standing to bring the Section 10(b) claim. On the other, the SPAs provide the terms on which, and specifically *where*, the Timberline Plaintiffs must assert such claims. When the Timberline Plaintiffs purchased their shares of Joonko, they agreed to the following conditions:

> 7.15 Dispute Resolution. (a) The [Timberline Plaintiffs] hereby irrevocably and unconditionally submit to the jurisdiction of … the United States District Court for the District of Delaware for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (ii) agree not to commence any suit, action or

14

> <mark>other proceeding arising out of or based upon this Agreement except in … the United States District Court for the District of Delaware</mark>, and (iii) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

(Doc. 26-2, p. 25). This forum selection clause, included in the 2021 Series A SPA, is nearly identical to the one included in the 2022 Series B SPA. The Timberline Plaintiffs agreed to these terms not once, but twice.

The Timberline Plaintiffs' Section 10(b) claim as well as the requisite purchase of the Joonko shares trace their origins back to the SPAs. So this action is one "arising out of or based upon" those agreements. (Doc. 26-2, p. 25). By the SPA's plain terms, the Timberline Plaintiffs agreed to bring their federal securities claim in the United States District Court for District of Delaware—not Alabama.

### B.  Plaintiffs' Venue Theory Disregards the SPAs

Plaintiffs try to evade the SPA's forum agreement by arguing that the Bankruptcy Court voided the SPAs and all obligations that went with them. Plaintiffs' argument hinges on their interpretation of two provisions in the Bankruptcy Court's Confirmation Order:

> 15. <u>Cancellation of Interests</u>. Except as otherwise provided in the Plan and in any contract, instrument, or other agreement or document created in connection with the Plan, on the Effective Date, all Interests shall be cancelled and each Holder thereof shall have no rights arising from or relating to such Interests or the cancellation thereof, except the rights provided pursuant to the Plan.

> 16. <u>Cancellation of Existing Securities and Agreements</u>. Except as otherwise provided in the Plan and in any contract, instrument, or other agreement or document created in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to Article III of the Plan, any promissory notes, share certificates, whether for preferred or common stock (including treasury stock), other instruments evidencing any Claims or Interests, and all options, warrants, calls, rights, puts, awards, commitments, or any other agreements of any character to acquire such Interests shall be deemed cancelled and of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order, or rule. The holders of or parties to such canceled notes, share certificates, and other agreements and instruments shall have no rights arising from or relating to such notes, share certificates, and other agreements and instruments or the cancellation thereof, except the rights provided pursuant to the Plan.

(Bankruptcy Docket No. 431, pp. 17-18).

Plaintiffs argue that "[b]ankruptcy cancels and overrides forum selection clauses and shareholders agreements, and the Bankruptcy court explicitly did so" in the Confirmation Order. (Doc. 36, p. 20). In Plaintiffs' view, the SPAs were "executory contracts" that were "cancelled by the United States Bankruptcy Court and the parties have no rights arising therefrom." (*Id.*) The court disagrees.

To start, the court disagrees that the SPAs are "executory contracts." Neither is the court convinced that the Confirmation Order completely voided the SPAs. But even if Plaintiffs were partially correct that the Bankruptcy Court cancelled the SPAs in some respect, the Confirmation Order did not eliminate the effect of the forum selection clauses.

Courts, both within this Circuit and without, have consistently "rejected the notion that termination of an agreement necessarily extinguishes its forum-selection clause." *Sensify (US) Inc. v. Intelligent Telematics N. Am., Inc.*, No. 16-24069-CIV, 2017 WL 1541424, *2 (S.D. Fla. Apr. 28, 2017) (collecting cases); *see also Manzo v. Wohlstadter*, 171 F.4th 112, 118 (1st Cir. 2026) (enforcing a forum selection clause in a promissory note after investors discovered the issuing company's fraud and the company entered bankruptcy); *In re Exide Techs.*, 544 F.3d 196, 218 n.15 (3d Cir. 2008) (observing that pre-plan forum-selection clauses are "presumptively valid" and "will be enforced unless the party objecting to its enforcement demonstrates that enforcement of the clause would violate a strong public policy of the forum").

To be sure, forum selection clauses are often enforced after the termination of the underlying contract when, as here, a survival clause ensures the continuity of other provisions in the contract. *See, e.g.*, *Future Indus. of Am., Inc. v. Advanced UV Light GMBH*, No. 3:09-CV-00966 JCH, 2010 WL 7865077, *3 (D. Conn. Sept. 1, 2010), *aff'd*, 434 F. App'x 46 (2d Cir. 2011); *Carter v. Roadsafe Traffic Sys., Inc.*, No. 3:09-CV-225-J-34JRK, 2010 WL 11507473, *6 (M.D. Fla. Jan. 12, 2010); *George V Eatertainment S.A. v. Elmwood Ventures LLC*, No. 1:22-CV-08047 (JLR), 2023 WL 2403618, *10 (S.D.N.Y. Mar. 8, 2023) ("[C]ourts have enforced similar dispute resolution clauses after termination of the underlying agreement, even where those clauses were excluded from an express survival clause in the agreement….").

Plaintiffs' briefing on this issue cites no legal authority to support their contention that the Confirmation Order voided the forum selection clauses in the SPAs. And Plaintiffs' insistence that the SPAs are completely void makes little sense considering their other standing arguments. As noted above, the SPAs are direct evidence of the purchase and sale of securities that establishes the Timberline Plaintiffs' standing to assert the Section 10(b) claim under *Blue Chip*. In addition, if Plaintiffs are correct that the Confirmation Order cancelled and erased all interests arising from the SPAs and all other shares and existing securities, then

17

the same Order would seemingly have terminated Plaintiffs' status as "shareholders." If that were so, then the Bankruptcy Court's subsequent order that "confers standing" to "Certain Shareholders" (i.e., the Plaintiffs) to bring claims against Joonko's directors would be peculiar given that Plaintiffs were no longer "shareholders" after the Confirmation Order purportedly terminated their interests. (*See* doc. 12-1).

Plaintiffs are in an awkward position. Depending on which part of Plaintiffs' arguments you are reading, the SPAs are either evidence that Plaintiffs purchased Joonko securities (standing exists, and the forum clauses presumptively attach) or the SPAs are a nullity (and standing is in serious doubt). As explained below, the court will resolve this inconsistency by enforcing the terms the Timberline Plaintiffs agreed to.

## C.    Transfer to Delaware

1. *Standard:* "Under federal law, forum selection clauses are presumptively valid and enforceable unless the plaintiff makes a strong showing that enforcement would be unfair or unreasonable under the circumstances." *Don't Look Media LLC v. Fly Victor Ltd.*, 999 F.3d 1284, 1297 (11th Cir. 2021) (internal quotation marks and citation omitted). "A valid forum-selection clause should be given controlling weight in all but the most exceptional cases." *Id.*, *citing Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 63 (2013) (citation modified).

A plaintiff can defeat the presumption that the forum selection clause is enforceable by showing: "(1) that the clause was induced by fraud or overreaching; (2) the plaintiff would be deprived of its day in court because of inconvenience or unfairness; (3) the chosen law would deprive the plaintiff of a remedy; or (4) enforcement of the clause would contravene public policy." *Don't Look Media*, 999 F.3d at 1297. But "[t]he fraud exception does not mean that any time a dispute arising out of a transaction is based upon an allegation of fraud, as in this case, the clause is unenforceable. Rather, it means that a forum-selection clause in a contract is not enforceable if the inclusion of that clause in the contract

18

was the product of fraud or coercion." *Id.* at 1298 (citation modified); *see also Krenkel v. Kerzner Int'l Hotels Ltd.*, 579 F.3d 1279, 1281 (11th Cir. 2009).

2. *Timberline Plaintiffs:* There is no allegation or evidence that the forum selection clauses in the SPAs were the product of fraud or coercion. In fact, the Timberline Plaintiffs agreed to the forum selection clause twice with a year between each agreement. So the court finds that the forum selection clauses in the SPAs are presumptively valid.

When an action is filed in contravention of a forum selection clause identifying a different federal district, the clause may be enforced through a motion to transfer venue. *See Atl. Marine Const. Co.*, 571 U.S. at 59; *see also* 28 U.S.C. § 1404(a) ("For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented.").

When "parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." *Atl. Marine Const. Co.*, 571 U.S. at 64. Instead, "a district court may consider arguments about public-interest factors only." *Id.* These factors include "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; and the interest in having the trial of a diversity case in a forum that is at home with the law." *Id.* at 62 n.6 (citation omitted).

"[A]s the party defying the forum-selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted." *Atl. Marine Const. Co.*, 571 U.S. at 63; *see also In re Ricoh Corp.*, 870 F.2d 570, 573 (11th Cir. 1989) ("When weighing whether transfer is justified under section 1404(a), a choice of forum clause is a significant factor that figures centrally in the District Court's calculus" such that "the venue mandated by a choice of forum

clause rarely will be outweighed by other 1404(a) factors.") (citation modified).

The Timberline Plaintiffs have failed to carry their burden to establish that enforcement of the SPA forum selection clauses would be unwarranted. The court finds that whatever effect the Confirmation Order had on the SPA, it did not invalidate the forum selection clauses. Based on this finding, and the terms of the agreement, the court knows that the Timberline Plaintiffs are subject to the forum selection clause that requires transferring their claim to the United States District Court for the District of Delaware.

3. *Remaining Plaintiffs:* What's less clear is whether the remaining Plaintiffs not named in the SPA are subject to the same agreement; the court simply has no evidence of the agreements through which they acquired their shares. Still, the court finds that transferring all Plaintiffs' federal claims to be in the public interest.

First, splitting the Timberline Plaintiffs from the others would frustrate judicial efficiency and cause administrative difficulties for both the courts and the parties. All the Plaintiffs here are asserting the same claims, under the same facts, against the same Defendants. If the Timberline Plaintiffs litigated this case in Delaware, and the other Plaintiffs remained in this court, it would create duplicative discovery obligations and could risk inconsistent results in identical cases. "There is a strong policy favoring the litigation of related claims in the same tribunal in order that: (1) pretrial discovery can be conducted more efficiently; (2) the witnesses can be saved time and money, both with respect to pretrial and trial proceedings; (3) duplicitous litigation can be avoided, thereby eliminating unnecessary expense to the parties and at the [same] time serving the public interest; (4) inconsistent results can be avoided." *Schneider v. Sears*, 265 F. Supp. 257, 266-67 (S.D.N.Y. 1967); *see also Garner v. Wolfinbarger*, 433 F.2d 117, 119 (5th Cir. 1970). The choice here is self-evident.

Transferring Plaintiffs' federal claim to the District of Delaware also comports with the federal securities statutory scheme. Under 15 U.S.C. § 78aa, the statute that gives the federal courts exclusive jurisdiction over Section 10(b) claims, a plaintiff may bring their claim in "any district." 15 U.S.C. § 78aa. That includes the District of Delaware. Likewise, under the statute's venue provision, venue for a Section 10(b) claim is proper where the defendant "transacts business." 15 U.S.C.A. § 77v. Plaintiffs' federal claim hinges on the theory that Defendants were control persons over Raz and Joonko. Joonko is a Delaware corporation and thus transacts business in Delaware. So again, Delaware satisfies the statute's venue requirements.

Finally, transferring Plaintiffs' federal claim aligns with the federal change of venue statute. 28 U.S.C. § 1404(a) empowers district courts to transfer "any civil action to any other district or division where it might have been brought[.]" As you can see, Plaintiffs could have (and perhaps should have) brought their Section 10(b) claim in the Delaware District Court in the first instance. So for the reasons explained above, the court will grant Defendants' motions to sever Plaintiffs' Count II federal securities claim and will transfer it to the United States District Court for the District of Delaware.

## II.   The State Law Fiduciary Duty Claim

That leaves Count III, in which Plaintiffs allege that Defendants Agmon and Oron breached their fiduciary duties owed to Joonko and its shareholders. Count III is a state-law claim that Plaintiffs pleaded under this court's supplemental jurisdiction. *See* 28 U.S.C. § 1367.

Defendants ask the court to dismiss Count III on *forum non conveniens* grounds because they say a different forum selection clause, one found in Joonko's former articles of incorporation, identifies Delaware as the necessary venue for state-law claims against members of Joonko's Board of Directors. The court is skeptical whether the forum selection clause in Joonko's *former* articles of incorporation would be enforceable at

21

this juncture. But the court needn't decide this issue because the simpler, more prudent approach is to decline to exercise supplemental jurisdiction over the state-law claim.

Under 28 U.S.C. § 1367, district courts may decline to exercise supplemental jurisdiction over a claim if "the district court has dismissed all claims over which it has original jurisdiction, or in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c)(3)-(4).

As explained above, the court will transfer Plaintiffs' only claim for which the court had original jurisdiction, the Count II federal securities claim. Plaintiffs have not pleaded that the court has original jurisdiction over their Count III fiduciary duty claim, nor have they shown that the requirements for diversity jurisdiction are satisfied. So the court will decline to exercise supplemental jurisdiction over that claim. *See* 28 U.S.C. § 1367(c)(3).

Even if § 1367(c)(3) alone were not sufficient reason to decline supplemental jurisdiction, § 1367(c)(4) supplies another. Because of the forum selection clauses in the SPAs, the Section 10(b) claim will be adjudicated in the District of Delaware. Other forum provisions may well have a similar effect on Plaintiffs' state-law claims. And, as earlier stated, litigating the same dispute between the same parties in two courts would be highly inefficient. The court leaves that choice to Plaintiffs. They may refile their fiduciary duty claims in Alabama state court, where Defendants remain free to press the same arguments for dismissal. Or, if Plaintiffs prefer to litigate the entire case in one forum, they may do so in Delaware. Either way, under the present circumstances, Plaintiffs' state-law claims belong in a forum other than this one.

22

## CONCLUSION

For the reasons stated within, the court will **GRANT IN PART** Defendants motions to dismiss or transfer venue. (Docs. 22, 26). The court will sever Plaintiffs' federal securities claim and transfer it to the United States District Court for the District of Delaware. The court will also decline to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claim. So the court will **DENY AS MOOT** the outstanding motions for sanctions, (docs. 23, 43), and will dismiss this case **WITHOUT PREJUDICE.**

The court will enter a separate order consistent with this memorandum opinion that closes this case.

**DONE** and **ORDERED** on August 4, 2026.

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE

23